UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X
NISSAN MOTOR ACCEPTANCE CORPORATION,

                    Plaintiff,

          -against-

FIVE TOWNS NISSAN, LLC; SHMUEL WOLF;
NEIL BARBAGALLO; and ALEX KORCHMAR;

                    Defendants.
------------------------------------X

MEMORANDUM, DECISION, &
ORDER AFTER BENCH TRIAL
16-CV-7028(JS)(ARL)

APPEARANCES
For Plaintiff:      Richard A. Braden, Esq.
                    Goldberg Segalla LLP
                    665 Main Street
                    Buffalo, New York 14203

For Defendant:      Phillip J. Campisi, Jr., Esq.
Shmuel Wolf         Westerman Ball Ederer Miller & Sharfstein LLP
                    1201 RXR Plaza
                    Uniondale, New York 11556


SEYBERT, District Judge:

          Plaintiff   Nissan   Motor   Acceptance   Corporation

("Plaintiff" or "NMAC") commenced this breach of contract action

against  Defendants  Five  Towns  Nissan,  LLC,  Shmuel  Wolf

("Defendant," "Wolf," or "Defendant Wolf"), Neil Barbagallo

("Barbagallo"), and Alex Korchmar ("Korchmar") seeking, inter

alia: (1) a money judgment in the amount of $1,848,128.54, plus

interest;  and  (2)  attorneys'  fees,  costs,  and  expenses  in

connection with litigation of this action.  (Am. Compl., ECF No.

33.)[1]  Five Towns Nissan, LLC, Barbagallo, and Korchmar were later dismissed from this action, leaving Wolf as the only remaining defendant.  (See ECF Nos. 48, 67.)  A bench trial was held before the undersigned on December 4, 2023.  (See Minute Entry, ECF No. 109.)  Pursuant to Federal Rule of Civil Procedure ("Rule") 52(a), the Court now issues its findings of fact and conclusions of law.[2]  After considering the evidence offered at trial, the arguments of counsel, and the controlling law on the issues presented, the Court finds in favor of Plaintiff.

## FINDINGS OF FACT

Based on the evidence presented, the Court makes the following findings of fact pursuant to Federal Rule of Civil Procedure 52(a).[3]  These findings of fact are drawn from witness testimony at trial ("Tr."), the parties' trial exhibits (labeled "Pl's Ex." for Plaintiff's exhibits, and "Def's Ex." for

---

[1] On August 13, 2018, Magistrate Judge Arlene R. Lindsay issued an Order deeming the First Amended Complaint the operative pleading. (See Aug. 13, 2018 Order, ECF No. 48.)

[2] After it received testimony, the Court required the parties to submit proposed findings of fact and conclusions of law.  (See Minute Entry.)  Plaintiff and Defendant filed their respective submissions on December 15, 2023.  (See Pl's Proposed FOF, ECF No. 111; Def's Proposed FOF, ECF No. 112.)

[3] To the extent any of the findings of fact may be deemed conclusions of law, they shall also be considered conclusions. Likewise, to the extent any of the conclusions of law may be deemed findings of fact, they shall be considered findings.  See Miller v. Fenton, 474 U.S. 104, 113-14 (1985) (noting the difficulty, at times, of distinguishing findings of fact from conclusions of law).

Defendant's exhibits), and the Stipulation submitted by the
parties on December 2, 2023 (Stipulation, ECF No. 108).

I.   <u>The Parties</u>

        Plaintiff NMAC is a California corporation engaged in
the business of providing, among other things, secured wholesale
inventory floor plan pricing for automobile dealerships throughout
the United States.  (Tr. 16:3-16.)  At all relevant times, former
Defendant Five Towns Nissan, LLC (the "Nissan Dealership") and
non-party Five Towns Automotive, LLC (the "Chrysler Dealership")
(collectively, the "Dealerships"), were New York limited liability
companies and car dealerships operating in Nassau County, Long
Island.[4]  (Tr. 20:11-16.)  As relevant here, former Defendant
Barbagallo was an owner and member of both the Nissan and Chrysler
Dealerships.  (Tr. 43:22-44:8; 54:5-9.)  Defendant Wolf was a
member of the Nissan Dealership, and was, at the very least,
involved in securing financing for the Chrysler Dealership.  (Tr.
125:14-16, 126:8-11; Pl's Ex. 1.)  Former Defendant Korchmar was
not a member of either Dealership but served as the day-to-day
manager of the Dealerships and the main contact person between the
Dealerships and NMAC.  (Tr. 44:14-45:18; 58:14-17.)

---

[4] The Court discusses former Defendants the Nissan Dealership,
Barbagallo, and Korchmar, and the non-party Chrysler Dealership,
only to the extent necessary to issue its findings of facts and
conclusions of law.

II.   <u>The Wholesale Financing Agreement and Continuing Guaranty</u>

On May 19, 2011, NMAC and the Nissan Dealership executed an Automotive Wholesale Financing and Security Agreement ("AWFSA"). (Pl's Ex. 1; Tr. 21:1-11.) The AWFSA established the terms under which NMAC would provide a wholesale line of credit to the Nissan Dealership so the Nissan Dealership could purchase new and used vehicles. (Tr. 22:11-15.) Defendant Wolf signed the AWFSA on behalf of the Nissan Dealership in his capacity as an "Operating Manager" of that Dealership. (Pl's Ex. 1.) As a part of the agreement to extend credit to the Nissan Dealership via the AWFSA, NMAC required Defendant Wolf to execute a broad Individual Continuing Guaranty Agreement ("Guaranty Agreement") whereby Defendant Wolf personally guaranteed the obligations and liabilities of the Nissan Dealership. (Pl's Ex. 2; Tr. 22:20-23:18.) The Guaranty Agreement stated, in pertinent part:

> To induce [NMAC or "Lender"] to extend or continue to extend credit to [the Nissan Dealership or "Dealer"] . . . [Defendant] Shmuel Wolf hereby unconditionally and irrevocably deliver(s) this Guaranty to Lender and hereby unconditionally and irrevocably guarantee(s) to Lender . . ., (a) <u>the full and prompt performance and payment of all present and future liabilities of Dealer to Lender irrespective of their nature and when they arise</u>, and (b) the due and punctual performance and observance of all agreements and indemnities of Dealer to Lender. . . .
>
> The <u>liabilities covered</u> by this Guaranty and hereby guaranteed by Guarantor (herein referred to collectively as the "liabilities")

4

include all obligations and liabilities of
Dealer (whether individually or jointly with
others, and whether direct, indirect,
absolute, or contingent as maker, endorser,
guarantor, surety or otherwise) to Lender, now
existing or hereafter coming into existence
and renewals or extensions in whole or in part
of any said liabilities, including without
limitation, (a) interest in other liabilities
arising or accruing after bankruptcy of Dealer
or any other obligor on said liabilities, and
(b) any and all damages, losses, costs,
interest, charges, attorneys' fees and
expenses of every kind, nature and description
suffered or incurred by Lender, arising in any
manner out of or in any way connected with, or
growing out of, said liabilities. . . .

The obligations of Guarantor under this
Guaranty shall be continuing, absolute, and
unconditional under any and all
circumstances . . . . This Guaranty is a
continuing guaranty and shall remain in force
at all times hereafter, whether there are any
liabilities outstanding or not, until a
written notice of termination from Guarantor
is received and acknowledged by
Lender . . . . Any such termination shall not
be effective as to any Guarantor who has
failed to give such notice . . . .

This Guaranty covers all liabilities to Lender
purporting to be incurred on behalf of Dealer
by any officer, agent or partner of said
Dealer, without regard to the actual authority
of such officer, agent or partner to bind
Dealer, and without regard to the capacity of
Dealer or whether the organization or charter
of Dealer is in any way defective.

(Pl's Ex. 2.)

Defendant Wolf executed the Continuing Guaranty on May

19, 2011. (Id.; see also Stipulation, ECF No. 108, at 1.)

Defendant Wolf never submitted a written notice of termination of

the Continuing Guaranty.  (Stipulation at 2.)  This Continuing Guaranty, whereby Defendant Wolf agreed to be held liable for the debts of the Nissan Dealership, is the only operative guaranty at issue.  (Id.)

### III. The Nissan Dealership's Default

In April 2012, the Nissan Dealership began defaulting on its obligations under the AWFSA. (Tr. 24:6-11.)  Under the AWFSA, when a car that had been financed by NMAC was sold by the Nissan Dealership, the Dealership was required to pay the underlying amount financed back to NMAC within a certain amount of time, depending on the type of sale. (Tr. 24:12-24.)  As of April 2012, the Nissan Dealership was failing to do so, which former Inventory Control Manager for NMAC, Randal Brooks (hereafter, "Brooks"), testified was "a huge problem" that would generally arise when dealerships were "short on cash," or needed cash to "pay for salaries of employees," "pay off . . . registration to the state," or pay off a customer's prior car loan. (Tr. 25:2-10.)  Despite the Nissan Dealership's default under the AWFSA, NMAC continued to loan money to the Nissan Dealership. (Tr. 25:11-13.)  In August 2013, NMAC made a capital loan (hereafter, "Capital Loan") for more than one million dollars to the Nissan Dealership. (Tr. 25:11-15.)  By 2014, the Nissan Dealership began defaulting on the Capital Loan. (Tr. 25:16-18.)  At or around the same time, the

Chrysler Dealership, also having received significant loans from NMAC, defaulted on its loans.  (Pl's Exs. 3, 4.)

By August 2014, NMAC decided to suspend all financing with the Nissan Dealership and declared all principal and interest due on both the AWFSA and the Capital Loan.  (Tr. 25:19-26:26:7.) On November 4, 2014, Brooks, on behalf of NMAC, sent a letter to former Defendant Barbagallo, informing him of the deficiency balances owed to NMAC by the Nissan and Chrysler Dealerships. (Pl's Ex. 3; Tr. 26:18-28:3.)  According to a December 4, 2014 NMAC internal catalog, the Nissan and Chrysler Dealerships collectively owed $7,010,939.56 to NMAC as of that date.  (Pl's Ex. 4.)

IV.  <u>The Replevin Action and Subsequent Settlement</u>

In conjunction with the August 2014 financing suspension decision, on August 29, 2014, NMAC commenced a replevin action against the Nissan Dealership, the Chrysler Dealership, Wolf, Barbagallo, and Kormachar to recoup money owed to it from the Nissan and Chrysler Dealerships.  (Tr. 26:9-17; <u>see generally</u> Replevin Action,[5] ECF No. 1.)  At or around October 2016, the parties to the Replevin Action began engaging in settlement discussions.  (<u>See</u> Replevin Action, ECF No. 37.)  Throughout

---

[5] <u>Nissan Motor Acceptance Corp. v. Five Towns Nissan, LLC, et al.</u>, 2:14-cv-05144 (E.D.N.Y. Aug. 29, 2014) (hereafter, the "Replevin Action").

settlement discussions, Defendant Wolf was represented by counsel. (Tr. 133:4-134:5.)   The Nissan and Chrysler Dealership were represented by separate counsel.  (Tr. 134:24-135:3.)  At or around the same time, the two Dealerships were set to be purchased by a third-party, Patrick Dibre (hereafter, "Mr. Dibre").  (Tr. 29:24-30:21; Tr. 118:13-16).

In order to effectuate an asset sale to Mr. Dibre and resolve the Replevin Action, the parties reached a settlement whereby the Nissan Dealership, the Chrysler Dealership, and former Defendant Korchmar agreed via a promissory note (hereafter, "Promissory Note") to be jointly and severally liable to NMAC for a total of $2,830,797.  (Pl's Ex. 5; see also Tr. 30:9-21.)  The total sum owed on the Promissory Note encapsulated the combined debts owed by the Nissan and Chrysler Dealerships, and included money owed by the Nissan Dealership to NMAC due to breaches of the AWFSA and the Capital Loan.  (Tr. 73:11-19.)  Defendant Wolf signed the Promissory Note in his representative capacity on behalf of the Nissan Dealership.  (Pl's Ex. 5.)

In reaching the settlement memorialized in the Promissory Note, Defendant Wolf simultaneously executed two additional contracts: an Affidavit of Confession of Judgment (hereafter, "Judgment Affidavit"); and, a Guarantors' Acknowledgement.  (Pl's Exs. 6-7.)  The Judgment Affidavit, which

Defendant Wolf executed in his representative capacity on behalf

of the Nissan Dealership, states, in pertinent part:

> [The Chrysler Dealership, the Nissan
> Dealership] and Alex Korchmar hereby <u>jointly
> and severally</u> confess judgment and authorize
> entry thereof against themselves in the sum of
> $2,830,797.00 or for such lesser amount as may
> be due pursuant to the terms of a certain
> <u>Promissory Note</u> they executed in favor of
> [NMAC] in January 2015.

(Pl's Ex. 6, at ¶5 (emphasis added).)  The Judgment Affidavit made

explicit reference to the Continuing Guaranty executed by

Defendant Wolf in May 2011, and did not express any intent to alter

the obligations of Defendant Wolf thereunder:

> At various times, and as required by [NMAC},
> Alex Korchmar, Neil Barbagallo, and Shmuel
> Wolf executed continuing Guaranty Agreements
> whereby they each guaranteed all obligations
> of [the Chrysler Dealership] and/or [the
> Nissan Dealership] to [NMAC]. Notwithstanding
> the foregoing, Shmuel Wolf maintains that he
> only executed one Continuing Guaranty
> Agreement with regard to [the Nissan
> Dealership] on May 19, 2011.

(<u>Id.</u> at ¶6(a).)  It further permitted NMAC to file the confession

of judgment against both Dealerships and former Defendant Korchmar

"in the event of a breach or default under" the terms of the

Promissory Note.  (<u>Id.</u> at ¶6(c).)

For the avoidance of doubt, Defendant Wolf also signed

a Guarantors' Acknowledgement whereby NMAC's explicitly reserved

its right to enforce the Continuing Guaranty against him.  (Pl's

Ex. 7.)  The Guarantors' Acknowledgment stated, in pertinent part:

> [NMAC] has not waived or discharged any rights
> it may have to enforce its rights under any
> Continuing Guaranty Agreement and/or any
> Cross-Guaranty, Cross-Collateral, and Cross
> Default Agreement that the Guarantors
> previously executed in NMAC's favor (whether
> individually or in their representative
> capacities) with respect to any pre- or post-
> closing deficiencies or breaches.
> Notwithstanding the foregoing, Shmuel Wolf
> maintains that he only executed one Continuing
> Guaranty Agreement with regard to [the Nissan
> Dealership] on May 19, 2011.  In addition,
> Guarantors hereby acknowledge that nothing
> NMAC has done or refused to do with respect to
> the Asset Sales will be construed as a
> limitation or waiver by NMAC of its rights and
> remedies against any Guarantors (whether
> individually or collectively) existing by any
> past, present, or future event of default
> under any written agreement between or among
> [the Nissan and Chrysler Dealerships], NMAC,
> and/or the Guarantors whether by contract or
> law.

(Pl's Ex. 7 (emphasis added).)

V.   Payments Received and Owed to NMAC

> After the execution of the Promissory Note, Judgment

Affidavit, and Guarantors' Acknowledgement, NMAC received a

combined total of $982,893.46 from the State of New York in

connection with a sale escrow account and from Mr. Dibre in

connection with certain cars that were sold at auction.  (Tr.

37:22-38:22; see also Pl's Ex. 8.)  The $982,893.46 payment was

applied to the principal due under the Promissory Note, bringing the total owed on the Note to $1,848,128.54.[6] (Id.)

## VI.  The Instant Action and Summary Judgment Decision

On December 21, 2016, NMAC commenced this action seeking, inter alia: (1) a money judgment in the amount of $1,848,128.54, the remaining debt owed under the Promissory Note, plus interest; and (2) attorneys' fees, costs, and expenses in connection with litigating this action.  (Am. Compl., ECF No. 33.) On May 29, 2020, upon construing all permissible factual inferences in Defendant Wolf's favor, this Court denied NMAC's motion for summary judgment, concluding there was a question of fact as to "whether the Promissory Note released Defendant [Wolf] from the [Continuing] Guaranty."  (Memo. & Order, ECF No. 83 (hereafter, the "Summary Judgment Order"), at 23-26.)  Upon hearing and evaluating the evidence presented at trial, and for the reasons that follow, the Court now concludes the Promissory Note did not release Defendant Wolf from the Continuing Guaranty he executed in NMAC's favor.

## CONCLUSIONS OF LAW

The sole issue before the Court is "whether the parties intended for Defendant to maintain responsibility for the Nissan

---

[6] NMAC secured a Judgement from Nassau County Clerk's Office in the amount of $1,848,128.54, which includes $225 in costs.  (See Pl's Ex. 8.)

Dealership's obligations" pursuant to the May 2011 Guaranty following the execution of the Promissory Note, Judgment Affidavit, and Guarantors' Acknowledgement, (hereafter the "Replevin Contracts.") (Summary Judgment Order at 19.) Upon evaluating the evidence presented, the Court answers that question in the affirmative. The unambiguous terms of the Continuing Guaranty and Replevin Contracts indicate the parties' intent for Defendant Wolf to remain liable for the Nissan Dealership's debts; therefore, the Court must find in favor of Plaintiff. The Court draws this conclusion based upon the following: (1) the Continuing Guaranty was broad and continuing such that it anticipated and intended to encapsulate future debts incurred by the Nissan Dealership, including the debts incurred via the Promissory Note; (2) even if, assuming arguendo, the Continuing Guaranty was not "broad and continuing", as the Court has found it to be, the Guarantors' Acknowledgment executed by Defendant Wolf clearly expressed the parties' intent to hold Defendant Wolf liable as a guarantor for debts incurred under the Promissory Note; and (3) Defendant Wolf has not brought forth any evidence, admissible or otherwise, sufficient to convince the Court that the parties did not intend for him to be personally liable for the Nissan

Dealership's debts pursuant to the Continuing Guaranty.  The Court discusses its conclusions in detail below.

I.   Wolf is Liable for the Nissan Dealership's Debts Under the Promissory Note Pursuant to the Continuing Guaranty

Under New York law, "an alteration of the contract to which the guaranty applies will serve to discharge the guarantor's obligation unless the guarantor has consented to the alteration." Arlona Ltd. P'ship v. The 8th of Jan. Corp., 857 N.Y.S.2d 208, 208–09 (N.Y. App. Div. 2008).  "The rationale for discharging a guarantor when the underlying contract is modified is that the modification substitutes a new obligation for the old one, and the guarantor cannot be held responsible for the failure of the principal to perform an obligation other than the obligation originally guaranteed." Id.  However, where a guarantor expressly "consent[s] to the alteration", the guarantor's obligation remains in effect despite the modification.  Id.; see also Trustco Bank New York v. Sage, 656 N.Y.S.2d 542, 543 (N.Y. App. Div. 1997) ("[D]ischarge is not warranted where, as here, the guaranty is a continuing one, and the 'new obligation' created by the modification, if independently incurred, plainly would have come within the scope of its coverage."); United Nat. Foods, Inc. v. Burgess, 488 F. Supp. 2d 384, 391–92 (S.D.N.Y. 2007) ("[A]n alteration to the underlying contract, even if material, prejudicial and done without the guarantor's knowledge, will not

13

release a guarantor where the language of the guaranty anticipates and consents to such modifications."); <u>CrossLand Fed. Sav. Bank by F.D.I.C. v. A. Suna & Co.</u>, 935 F. Supp. 184, 200 (E.D.N.Y. 1996) ("Under New York law, a guarantor's advance consent to modifications is valid and enforceable.").

Here, the Continuing Guaranty signed and agreed to by Defendant Wolf expressly contemplates, and approves of, modifications to the guaranteed debt. The Continuing Guaranty states, in pertinent part:

> [Defendant] Shmuel Wolf . . . hereby <u>unconditionally and irrevocably . . . guarantee(s)</u> to [NMAC] . . . the full and promote performance and payment of <u>all present and future liabilities of [the Nissan Dealership] to [NMAC] irrespective of their nature or the time they arise.</u> . . . The liabilities covered by this Guaranty and hereby guaranteed by [Defendant Wolf] . . . include all obligations and liabilities of [the Nissan Dealership] (<u>whether individually or jointly with others</u>, and whether direct, indirect absolute or contingent as maker, endorser, guarantor, surety, or otherwise) to [NMAC], <u>now existing or hereafter coming into existence</u> and renewals or extensions in whole or in part of any said liabilities, including without limitation . . . <u>any and all damages, losses, costs, interest, charges, attorneys' fees and expenses of every kind</u>, nature and description suffered or incurred by [NMAC], arising in any manner out of or in any way connected with, or <u>growing out of, said liabilities</u>.

(Pl's Ex. 2 (emphasis added).) The language of the Continuing Guaranty expressly contemplated the Nissan Dealership would, as it

did, incur additional debt jointly and severally with others, and that such debt would be guaranteed by Defendant Wolf.  (Id.) Moreover, the Continuing Guaranty unambiguously sought to hold Defendant Wolf liable for NMAC's attorneys' fees, should it need to sue to enforce the guaranty, as it did here.  (Id.)

"Where the terms of a contract are clear and unambiguous, the rights and obligations detailed therein should be enforced as written."  AXA Glob. Risks U.S. Ins. Co. v. Sweet Assocs., Inc., 755 N.Y.S.2d 759, 760 (N.Y. App. Div. 2003).  Here, the terms of the Continuing Guaranty could not be more clear, and Defendant Wolf agrees that he signed it.  (Stipulation at 2 ("Wolf will not dispute that he signed the [Continuing Guaranty] and will not contend that he ever submitted a written notice of termination of the [Continuing Guaranty] to NMAC.").)  Accordingly, the Court must enforce the Continuing Guaranty as written, and hold Defendant Wolf liable for the Nissan Dealership's debts under the Promissory Note in the amount of $1,848,128.54, and for NMAC's attorneys' fees in connection with this litigation.  See HSH Nordbank Ag N.Y. Branch v. Swerdlow, 672 F. Supp. 2d 409, 418 (S.D.N.Y. 2009), aff'd sub nom. HSH Nordbank AG N.Y. Branch v. St., 421 F. App'x 70 (2d Cir. 2011) (enforcing "absolute and unconditional" guaranty despite defendants' arguments that their obligations were discharged based upon modifications to the underlying loan agreement); see also United Nat. Foods, 488 F. Supp. 2d at 395

15

(inquiring whether the guaranty at issue was continuing because, if it was, defendant "would be bound by the new obligations assumed by the guaranteed" entity); <u>P.T. Bank Cent. Asia v. Wong</u>, 901 F. Supp. 572, 579 (E.D.N.Y. 1995) ("Unless the parties to a continuing guarantee provide otherwise in the writing, such a guarantee is not limited to the life of loans executed contemporaneously therewith, . . . and generally cannot expire by mere conduct, . . . change of circumstances, . . . or lapse of time.") (internal quotation marks omitted) (alterations in original).

II.  <u>Even If the Continuing Guaranty Were Not "Continuing," the Replevin Contracts Evidence the Parties' Intent to Hold Defendant Wolf Liable for the Nissan Dealership's Debts</u>

Even if the Continuing Guaranty in this case were not "continuing," as the name suggests, the Replevin Contracts make clear that the parties intended for Defendant Wolf to be held liable for the Nissan Dealership's debts, if any, under the Promissory Note.  First, and most importantly, the express terms of the Guarantors' Acknowledgement, executed by Defendant Wolf in conjunction with the Promissory Note, evidence the parties' intent for Defendant Wolf to remain bound by the Continuing Guaranty. (Pl's Ex. 7.)  The Guarantors' Acknowledgement explicitly and unambiguously states, "[NMAC] has not waived or discharged any rights that it may have to enforce its rights under any Continuing Guaranty Agreement" and even references the Continuing Guaranty by name and date, stating "[n]otwithstanding the foregoing, Shmuel

16

Wolf maintains that he only executed one Continuing Guaranty Agreement with regard to [the Nissan Dealership] on May 19, 2011." (Pl's Ex. 7.)  Notwithstanding this statement of Defendant Wolf's position concerning the number of guaranty agreements he signed, the plain language of the Guarantors' Acknowledgement makes clear that the guarantors – including Defendant Wolf – acknowledged NMAC was not waiving any of its rights to seek remedies against the guarantors for any defaults under any of the guaranty agreements. (See id.)  Thus, the parties' intent not to discharge the Continuing Guaranty despite the execution of the Promissory Note could not be more clear: Defendant Wolf was to remain bound by the Continuing Guaranty for any debt owed to NMAC by the Nissan Dealership under the Promissory Note.  (Id.)

Second, while Defendant Wolf has maintained, via his testimony, and an inadmissible exhibit – Defendant's Exhibit J[7]

---

[7] At trial, the Court reserved decision as to whether Defendant's Exhibit J, an email between NMAC and Defendant's counsel regarding "conditions for closing" on the Replevin Contracts, was admissible. (Tr. 78:19-79:4 (Court stating, "I tend to agree with [P]laintiff [that Exhibit J is inadmissible], but I'll consider it further."); see also Tr. 112:6-113:2 (Defendant acknowledging Plaintiff's pending objection with regard to Exhibit J).)

Upon said further consideration, the Court finds Exhibit J to be inadmissible parol evidence.  See CVS Pharmacy, Inc. v. Press Am., Inc., 377 F. Supp. 3d 359, 374 (S.D.N.Y. 2019) ("It is well settled that extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous on its face."); see also U.S. ex rel. AWL Indus., Inc. v. Site Remediation Servs. Corp., 92 F. Supp. 2d 132, 135 (E.D.N.Y.

- that the parties did not intend for him to remain bound by the Continuing Guaranty; the Court is not convinced. (Tr. 123:13-124:5.) Defendant's Exhibit J, which the Court declines to consider as parol evidence, is an email sent from NMAC's counsel to Defendant Wolf's counsel and others outlining the "conditions for closing" on the Promissory Note. (Def's Ex. J). These conditions, which were never incorporated into the final Replevin Contracts, include a proposed "waterfall" provision which would

---

2000) ("Where the terms of a contract are clear and unambiguous, and reasonable people could not disagree as to the meaning of the text, the contract's interpretation is a question of law to be answered by the court. In such cases, the contract is to be interpreted with reference only to the four corners of the document and evidence as what was really intended but instated or misstated is generally inadmissible.") (internal quotation marks and citations omitted).

The Promissory Note, read in conjunction with the Judgment Affidavit, and Guarantors' Acknowledgment, makes clear that the parties intended for NMAC to be able to recover against Defendant, pursuant to the Continuing Guaranty, in the event NMAC was unable to recover debt owed by the signatories to the Promissory Note. (Pl's Ex. 7 (expressly stating that NMAC has not waived its rights under the Continuing Guaranty)); see also Liberty USA Corp. v. Buyer's Choice Ins. Agency LLC., 386 F. Supp. 2d 421, 425 (S.D.N.Y. 2005) ("In New York, it is the general rule that written contracts executed simultaneously and for the same purpose must be read and interpreted together."). Accordingly, the Court declines to consider Defendant's Exhibit J. To the extent there is any tension between this Court's ruling on the admissibility of Exhibit J and statements made by the Court in dicta in its prior Memorandum and Order Denying Plaintiff's Motion for Reconsideration (see ECF No. 89), the Court finds, on this more developed record, and in the absence of any compelling evidence by Defendant as to why such extrinsic parol evidence should be considered, Exhibit J is inadmissible.

18

ensure payments made on the Promissory Note were credited in a specific order. (Id.; see also Pl's Exs. 5-7.) According to Defendant Wolf, the waterfall provision evidences the parties' intent to hold him liable only for the Nissan Dealerships' debts, which would have been credited first under the provision if implemented into the final contract. (Id.; Tr. 123:13-124:5.)

However, even if the Court were to consider Exhibit J, which it will not, this evidence would not disturb the Court's conclusion that the parties intended for Defendant Wolf to remain liable to NMAC for the Nissan Dealership's debts under the Promissory Note. The Promissory Note clearly states all signatories, including the Nissan Dealership, are "jointly and severally" liable for entire sum of $2,830,797. (Pl's Ex. 5.) Any misunderstanding or contrary interpretation by Defendant Wolf is of no consequence. Herrera v. Eastside Wok, Inc., No. 13-CV-9137, 2014 WL 6678281, at *3 (S.D.N.Y. Nov. 25, 2014) ("In light of this well-established principle of New York contract law governing joint and several liability, defendants' interpretation of the agreement set forth on the record is not 'sufficiently reasonable to render [it] ambiguous.'") (citation omitted). This is especially true where, as here: (1) Defendant Wolf was represented by competent counsel who understood, or should have understood, that joint and several liability permits a plaintiff

to "collect that <u>entire amount</u> from one defendant, in full, without collecting anything from" other parties who are also jointly and severally liable for such debts; and; (2) because Defendant Wolf is jointly and severally liable for the total debt amount under the Promissory Note, any "waterfall" provision would not affect Defendant's liability for the total debt.  <u>United States v. Yalincak</u>, 30 F.4th 115, 122 (2d Cir. 2022) ("Where two co-defendants in a civil lawsuit are found jointly and severally liable for the full amount of the damages, the plaintiff can collect that entire amount from one defendant, in full, without collecting anything from the other defendant.").

Moreover, Defendant Wolf's testimony that he believed he would not be personally liable for the debts of the Nissan Dealership following the execution of the Replevin Contracts is not credible considering the Replevin Contracts explicitly state otherwise, and Defendant Wolf was represented by counsel who was presumably equipped to understand the basic legal tenet of joint and several liability and the affects of a continuing guaranty.[8]

---

[8] To the extent Defendant Wolf was misled by his personal attorney with regard to: (1) the terms of the Continuing Guaranty; (2) the terms of the Replevin Contracts; and (3) NMAC's right to enforce the Continuing Guaranty against him, Defendant's remedy sounds in a tort action against such attorney.  <u>See</u> <u>Swift v. Choe</u>, 674 N.Y.S.2d 17, 21 (N.Y. App. Div. 1998) (where plaintiff claimed his attorney "violated the duty of care owed to clients by failing to provide necessary and appropriate advice").

(<u>Compare</u> Tr. 123:13-124:5, 134:11-15 (Defendant stating his belief that, upon signing the Replevin Contracts he would not be "liable for anything") <u>with</u> Pl's Exs. 5-7, <u>and</u> Tr. 134:2-5 (Defendant stating he was represented by counsel, who negotiated the terms of the Replevin Contracts)).   This conclusion is buttressed by the fact that, here, the Continuing Guaranty was unambiguous, was expressly referenced and affirmed by the Guarantors' Acknowledgment, and could only be terminated by "a written notice of termination from [Defendant Wolf]."[9]   <u>Ford Motor Credit Co. v. Miller</u>, 990 F. Supp. 107, 111 (N.D.N.Y. 1998) (holding guaranty enforceable despite defendants' claim that they were told there were no guaranties in effect because defendants were "sophisticated businessm[e]n" and "knew or should have known that, under the contract, the guarantee could only be terminated by registered mail") (<u>see also </u>Pl's Ex. 2).

Indeed, had Defendant Wolf intended to no longer be bound by the Continuing Guaranty, he could have acted, by and through his attorney, to do any of the following: (1) negotiate specific terms to be included in any of the Replevin Contracts that would terminate Defendant's Continuing Guaranty; (2) refuse to sign the Replevin Contracts, since they included language whereby Defendant

---

[9] Defendant admits he did not provide NMAC with a written notice of termination of the Continuing Guaranty as required by its express terms.   (Stipulation at 2.)

remained liable for the Nissan Dealership's debts; or (3) send written notice to NMAC of Defendants' intent to terminate the Continuing Guaranty.  However, Defendant Wolf and his attorney took none of these actions, and instead, agreed to the opposite.

Where a written agreement is "complete, clear, and unambiguous on its face," the Court must enforce it according to the plain meaning of its terms, and "where consideration of the contract as a whole will remove the ambiguity created by a particular clause, there is no ambiguity." L. Debenture Tr. Co. of N.Y. v. Maverick Tube Corp., 595 F.3d 458, 467 (2d Cir. 2010). The Replevin Contracts, read as a whole, make clear by their express terms, that the parties' intended to hold Defendant Wolf liable for the Nissan Dealership's debts, including any debt incurred via the Promissory Note.  The purported evidence to the contrary submitted by Defendant Wolf, admissible or otherwise, is not compelling in light of the parties' express agreements.  The Court must, therefore, find in favor of Plaintiff.

<u>CONCLUSION</u>

For the foregoing reasons, the Court finds in favor of Plaintiff.  It is therefore ORDERED, ADJUDGED and DECREED, Plaintiff shall have judgment against Defendant Shmuel Wolf in the amount of $1,848,128.54, plus the applicable statutory pre-and-post-judgment interest; and reasonable attorneys' fees and costs.

Plaintiff is directed to submit a fee and cost application for the Court's review and approval.  Plaintiff's application shall include contemporaneous time records and reflect "reasonably hourly rates in this district." Hugee v. Kimso Apartments, LLC, 852 F. Supp. 2d 281, 298 (E.D.N.Y. 2012).  The Clerk of the Court is directed to enter judgment consistent with these Findings of Fact and Conclusions of Law, and to mark this case CLOSED.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.


Dated:    May 29, 2024
          Central Islip, N.Y.